THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT E. STREMMEL II, Defendant-Appellant.

Second District    No. 2—91—1017

Opinion filed March 21, 1994.—Rehearing denied April 20, 1994.

94

G. Joseph Weller and Ingrid L. Moller, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

A jury in the circuit court of Winnebago County convicted defendant, Robert E. Stremmel II, of first degree murder. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1) (now 720 ILCS 5/9—1(a)(1) (West 1992)).) Defendant was sentenced to 100 years' imprisonment. Defendant appeals his conviction and sentence.

On appeal, defendant contends that: (1) the trial court erred in admitting DNA testing evidence and associated statistical evidence; (2) the State failed to prove his guilt beyond a reasonable doubt; (3) the trial court erred in declining to excuse a prospective juror for cause; (4) the trial court erred in allowing the State to impeach three of its own witnesses; (5) the trial court erred when it allowed certain photographs to go to the jury room; and (6) the trial court erred in sentencing him. Because we reverse and remand for a new trial, we will not address the last issue regarding an excessive sentence.

The following evidence was adduced at trial. On April 4, 1990, David Burns was found dead in his home in Rockford. Burns' body was lying in a pool of blood in the living room of his single-family house. An autopsy showed that the cause of death was a brutal beating with a blunt instrument which inflicted multiple head injuries, brain damage and injuries to other parts of Burns' body. The murder weapon was not found. The forensic pathologist who conducted the autopsy testified that some of the wounds could have been caused by the rounded end of a tire iron or a hammer. In addition, a number of the wounds were consistent with a heavy blunt instrument with a pointed end such as the end of a tire iron designed to remove hub caps.

There are no known eyewitnesses to the murder. There were no signs of forced entry to the house. There were no signs of a struggle. There was no evidence of a robbery or burglary. The body showed evidence of defensive wounds such as contusions on the arms and hands.

In the room where the body was found, there were large amounts of blood on the floor and blood was spattered on all the walls and the ceiling. There was also blood in the adjoining rooms. The State presented expert testimony that the perpetrator could have had only a little blood on himself despite the large amount of blood spattered at the scene of the crime.

On a wood floor area near the entry to an adjoining bedroom, crime scene investigators found a number of bloody partial shoeprints. It was ultimately determined that a size 11 to 12 Converse leather basketball shoe made the prints. The shoes recovered from Burns' body were size 9 and were not Converse. Defendant's shoe size was $11^1/_2$ or 12.

Investigators recovered a total of 20 latent fingerprints from various items at the crime scene such as beer cans and a potato chip bag. Fifteen of these prints were identified to the victim. Three of the prints were palm prints which were unacceptable for print matching. Of the remaining two fingerprints, one was excluded from identification with defendant and the other was inconclusive.

Burns and defendant knew each other from their occasional attendance at the same Alcoholics Anonymous (AA) meeting which met daily in Rockford at various times. There is no evidence that Burns and defendant knew each other socially. When they both attended the same meeting, Burns and defendant sometimes greeted each other. Burns and defendant sat next to each other during an AA meeting on at least one occasion.

On the evening of April 3, 1990, defendant left his family residence in Stillman Valley after telling his father that he intended to attend an 8 p.m. AA meeting in Rockford. Defendant drove himself in a brown 1970 Chevy pickup truck. Later that night, Burns and defendant spent several hours drinking in the Kishwaukee Tap, a tavern in Rockford. Burns and defendant were drinking in the tavern from some time after 9 p.m. until approximately 2 a.m. There is evidence that they arrived at the tavern together. Lisa Faber, one of the two bartenders on duty at the Kishwaukee Tap that night, at first testified that she could not remember whether Burns came into the bar with anyone else. After being shown a police report, however, Faber remembered that she had previously told the police that Burns had arrived at the bar with a big muscular guy whom she identified as defendant.

Even if they arrived at the tavern together, Burns and defendant spent little, if any, time together in the tavern. Several witnesses testified that Burns sat at the end of the bar drinking beer while defendant circulated around the bar playing pool, talking to people, and drinking vodka and orange juice.

Sometime after midnight, one of the tavern regulars, Sam Carter, joined Burns at the bar and the two talked for about an hour. Burns told Carter that he was not driving and was with a man in the bar, a big muscular guy, who was moving around inside the bar. Carter was unable to identify defendant at the trial. Burns also told Carter that he was having problems with his wife because of his drinking. Carter wrote down and gave Burns the phone number of his mother who, Carter explained, might be able to help Burns with his drinking problem. Police were able to trace Burns' activities on the night he was murdered to the Kishwaukee Tap after they found the name "Sam" (Carter's first name) and a phone number on a bar napkin in Burns' wallet which was recovered as evidence at the scene of the crime.

The other bartender on duty at the Kishwaukee Tap on the night in question, Bob Cooney, readily identified defendant as being in the bar that night. Cooney was unsure when defendant arrived, but after once noticing defendant in the bar, Cooney closely watched defendant for two to three hours until the bar closed at 2 a.m. Cooney watched defendant closely because defendant was "acting kind of strangely" in that, although not a regular patron, defendant roamed all over the bar talking to regulars. At one point, defendant grabbed one of the regulars in a headlock and Cooney quickly approached defendant and the other patron, separated them, and calmed them down. The patron who was in the headlock was not hurt in any way, and defendant took the headlock off as soon as Cooney approached.

One of the patrons in the Kishwaukee Tap on the night in question, Mark McNamara, also remembered defendant quite well. McNamara recalled that defendant took offense when a drunken patron by the name of Chuck, who was walking around the bar calling everyone an "asshole," called defendant an asshole. McNamara testified that when Chuck called defendant an asshole, defendant became very upset and approached Chuck, but McNamara got between them and told defendant to settle down. McNamara kept talking to defendant for a while. When defendant stated that he wanted to play pool, McNamara recalled that defendant again got "really mad" because the regulars would not allow him to play pool. After a while, the regulars relented and told defendant that he could play pool. McNamara and defendant walked over to a booth and kept talking until defendant was actually allowed to play. At the trial, McNamara testified that defendant was wearing a white T-shirt, jeans, and tennis shoes, but could not at first remember the type of tennis shoes. After having his memory refreshed, McNamara remembered telling the police that defendant wore low cut Converse

tennis shoes and that he knew they were Converse because they had a star on the side.

Burns was last seen alive when he left the Kishwaukee Tap alone about 1:50 a.m. on April 4, 1990. About 10 minutes later, defendant also left the tavern alone. Bartender Cooney specifically remembered defendant leaving because Cooney saw defendant carry a drink outside and Cooney had to go after defendant and retrieve the drink. Cooney recalled that defendant was walking alone heading for the back of the building at that time. In addition, defendant returned alone to the locked tavern a few minutes later and knocked on the door to inquire whether he had left a pack of cigarettes inside the tavern.

Defendant was next seen at 5 a.m. the same morning asleep in the backseat of one of his family's cars at the family residence. The 1970 Chevy pickup which defendant had driven to the meeting was parked nearby. Defendant's father found defendant asleep in the car at 5 a.m. when defendant's father left the family house to go to work. Because defendant's father knew that defendant had been drinking and that defendant was subject to epileptic seizures, defendant's father closely examined defendant for signs of harm. Defendant's father testified that he found no evidence of harm to defendant and no blood on defendant at that time.

The police first interviewed defendant on April 21, 1990. During the interview, defendant stated that he knew who Burns was, but had never been with Burns socially. Defendant also stated that his mother usually drove him to the AA meetings and on the few occasions when he drove himself he drove one of four family vehicles. Defendant did not mention the 1970 Chevy pickup truck as one of the vehicles he might drive alone to AA meetings. Defendant denied being in a bar on April 3 and 4, 1990, and said the last time he drank was two months prior to the interview. Defendant continued to deny being in a bar even when directly confronted with information that witnesses had identified him at the Kishwaukee Tap on the night of the murder. Defendant also denied owning any white tennis shoes, stating that the only pair of athletic shoes he owned was the pair he was wearing during the interview. The pair of athletic shoes defendant wore during the interview were not Converse athletic shoes and were not white. Defendant stated that he kept a daily diary of his activities and it might help him remember where he was on the night in question.

After obtaining consent to conduct a search, the police searched defendant's room in the family residence and found a small spiral notebook with a yellow cover on the headboard of defendant's bed

where defendant stated it would be. While the police were in defendant's home, defendant approached one of the detectives, took another small spiral notebook with a gray cover out of a coat pocket, and said "Here, I forgot this. You might as well have this too."

The two notebooks contained entries from November 28, 1989, through April 20, 1990. There is an occasional day or two missing, but otherwise the entries are daily. The first entry in the gray notebook is dated March 6, 1990, and the last entry is dated April 20, 1990. However, the entries in the gray notebook stopped with the entry dated April 2, 1990, and do not resume until the entry dated April 20, 1990. The back cover of the gray notebook states that the notebook contains 60 sheets; however, there are only 48 sheets in the gray notebook.

Cindy Menzel was a waitress at a restaurant in Stillman Valley. Menzel testified at the trial that defendant and his mother came to the restaurant to eat every day except for a couple of days early in 1990 when defendant did not come into the restaurant. Menzel found it unusual that defendant did not come in those days and recalled that when defendant did come in he had scratches on his face. Menzel testified that she could not remember the exact days defendant missed coming into the restaurant, but thought they were late in March or early in April 1990. On cross-examination, Menzel testified that police officers who interviewed her on April 24, 1990, raised the specific dates of April 3 and 4, 1990, and that she did not tell the officers those were the specific dates the defendant missed coming into the restaurant. Menzel also testified on cross-examination that defendant received the scratches on his face when he had an epileptic seizure. One of the police officers who interviewed Menzel, Detective Forrester, subsequently testified that Menzel recalled the dates of April 3 and 4 as the days defendant missed without any prompting from the officers who interviewed Menzel.

At the trial, Menzel could not recall telling police officers who interviewed her that defendant usually wore a pair of high top leather Converse basketball shoes. Menzel also could not remember telling the officers that defendant wore those shoes daily until about a week before the officers interviewed her when defendant stopped wearing them. Detective Forrester subsequently testified that Menzel told him that defendant wore Converse tennis shoes almost daily until about a week before Menzel was interviewed.

Defendant's father testified that another son, Neil, who was attending college in Peoria, drove the 1970 Chevy pickup truck to Peoria on April 7, 1990. Defendant's father further testified that Neil did this because he was having mechanical problems with his own

car and needed a substitute vehicle. Neil was supposed to keep the truck only for a short period, but the truck developed mechanical problems too and became inoperable. At his father's direction, Neil had the truck towed to and parked in a parking lot near his fraternity house at the college in Peoria.

On April 27, 1990, Rockford police went to Peoria and located the 1970 Chevy pickup truck which defendant drove on the night of the murder. Pursuant to a search warrant, the police arranged for the truck to be shipped back to Rockford and impounded. A subsequent search of the truck revealed the following: (1) a jack set which was complete except for the tire iron, which was missing and has not been found elsewhere; (2) a blue-tinted contact lens on the floor of the truck between the left side of the passenger seat and the center console; (3) a tiny stain on the brake pedal; and (4) a small bloodstain on the foam padding of the driver's seat where the seat cover had been worn away or removed.

A forensic scientist with the Illinois State Police crime lab made a probable finding of human blood with regard to the stain on the brake pedal. He submitted the entire brake pedal to the FBI for testing. The FBI returned the brake pedal without a report regarding the testing on it because the stain was deemed too small for testing.

The pathologist found no contact lenses on Burns' body. Burns wore contact lenses every day, all day. His lenses were not found at the scene of the crime. Police found Burns' lens storage case at the crime scene, but the case was empty.

Debra Kellem, the manager of the optical store where Burns purchased contact lenses on May 30, 1989, testified that she dispensed blue-tinted gas permeable lenses manufactured by Art Optical to Burns. Kellem produced business records showing the prescription of Burns' lenses. The prescription for Burns' right lens was a base curve of 7.70, diameter of 9.2, and power of minus 3. The prescription for Burns' left lens was a base curve of 7.80, diameter of 9.2, and power of minus 3.

An optician measured the lens found in defendant's truck. The lens had a base curve of 7.80, diameter of 9.2, and power of minus 275, which is consistent with a prescription of minus 3.

Herman Young, a contact lens expert, examined the lens found in defendant's truck. Young determined that one of two area manufacturers, either H&R Optical or Art Optical, manufactured the lens. Young based his determination on the distinctive finish on the lens which results from equipment used only by those two manufacturers. Based on the number of increments within the normal range of contact lenses for base curve, diameter, and power,

Young calculated that there were 83,200 different possible combinations of these measures.

The FBI conducted DNA testing on several blood samples including the blood found on the driver's seat in defendant's truck, defendant's blood, and Burns' blood. The DNA testing showed that the DNA in defendant's blood did not match the DNA in the blood found on the seat in defendant's truck. The DNA testing showed that the DNA in Burns' blood (the sample of which was taken from his body at the autopsy) matched the DNA in the blood found on the seat in defendant's truck.

The FBI calculated a probability estimate of the chance that the DNA match was random. The FBI calculated that the chance of a random match between the DNA in Burns' blood and the DNA in the blood found on the seat in defendant's truck was 1 in 1.8 million.

At the trial, each side called two expert witnesses who testified about the DNA testing. The State's experts generally testified that the FBI had followed its protocols and procedures for DNA testing and that the probability estimate was reliable. Defendant's experts testified that the FBI failed to follow its protocols and procedures in conducting the DNA testing in this case and that the probability estimate was unreliable. Defendant was found guilty by a jury and sentenced to the maximum extended term of 100 years.

## ADMISSION OF DNA EVIDENCE

Defendant was convicted entirely on the basis of circumstantial evidence. An important piece of the circumstantial evidence was the matching via DNA testing of the small bloodstain found on the driver's seat in defendant's truck with Burns' blood. The first issue on appeal raises questions regarding the admissibility of DNA testing evidence and the calculation of probability estimates based on the DNA testing evidence.

The trial court conducted extensive pretrial hearings on the admissibility of this evidence. The court heard testimony from six experts, four for the State and two for defendant, on these issues. Subsequently, the trial court issued a carefully reasoned memorandum of decision holding that it was "more probable than not" that the DNA testing evidence and the related statistical analysis were generally accepted by the relevant scientific communities and could therefore be presented to the jury.

In addressing this issue, we will first discuss, in simplified terms, the scientific background of DNA testing and the procedures and techniques used to develop DNA testing evidence and concomitant statistical analysis. Next, we will consider the legal standards for the

admission of evidence of this type and apply these standards to this case.

## DNA TESTING—SCIENTIFIC BACKGROUND

### 1. GENETIC THEORY UNDERLYING DNA TESTING.

The human body is composed of microscopic cells. All cells in the human body with a nucleus contain DNA, deoxyribonucleic acid, which functions as a genetic blueprint in cell reproduction. DNA is configured the same in each cell of an individual and the DNA configuration remains the same throughout an individual's life. Except for identical twins, each person's DNA is different from every other person's DNA. Although less than 1% of a person's DNA is unique (the rest is virtually the same for the entire human population), there are large differences between and among individuals.

The points of variation among individuals exist in the sequence of subunits, called bases, within the chain-like structure of DNA. There are four different bases in DNA which are designated by the letters G, C, A, and T. The overall structure of a DNA molecule is a double helix with interconnected strings of bases forming a twisted spiral staircase with complementary pairs of bases forming the steps. The strings are complementary because each base pairs only with one of the other bases. Where there is a T base in one string there is always an A base in the other and it is the same for the G and C bases. Because of this complementary relationship between bases, the DNA is able to replicate itself when a cell divides. The differences between individuals have to do with the sequences, especially CAT sequences, of the bases in a single strand of DNA. Everyone has CAT sequences in their DNA, but each individual's sequences have a different length. Differences in length in the various base sequences are called polymorphisms. A sequence of base pairs responsible for producing a particular trait is called a gene. Some genes are polymorphic and may have two or more different versions called alleles which determine contrasting characteristics.

There are approximately 3 million distinguishable polymorphisms between individuals. Examination of all these polymorphisms is not currently feasible, but examination of a small number of polymorphic sites can establish a DNA profile which can be compared to the DNA profile of another DNA sample. This is accomplished by chemically cutting a DNA sample at a known site, locating certain pieces, measuring those pieces, and then comparing measurements between samples. The DNA testing process does that.

## 2. FBI DNA TESTING PROCEDURE.

To obtain a permanent, readable and measurable DNA profile from a given DNA sample, the FBI uses a process known as restriction fragment length polymorphism (RFLP). The RFLP procedure is usually broken down into six steps. In step 1, "extraction," the lab extracts the DNA from a biological specimen such as blood or semen.

In step 2, "restriction digestion," the DNA is exposed to a restriction enzyme. This restriction enzyme acts as a kind of chemical scissors to cut through both DNA strands only at specific sites or loci. The resulting fragments of DNA are called restriction fragments and those containing sequences of base pairs repeated over and over, called variable number tandem repeats (VNTR), will vary in length.

In step 3, "gel electrophoresis," the fragments are separated on the basis of size. The lab places the restriction-digested fragments into a gel which acts like a molecular sieve when an electric current is applied to the gel causing the fragments to move. Because the longer fragments move more slowly through the gel than the shorter fragments, after a time, the fragments are arrayed across the gel according to their length. During this step, the DNA is also denatured so that the two complementary strands are separated into single strands.

In step 4, "Southern transfer," a permanent copy of the separated fragments is made by transferring them to a nylon membrane. The fragments are arrayed on the nylon membrane exactly as they existed in the gel.

In step 5, "hybridization," fragment locations on the membrane are established. This is done by using radioactively tagged DNA probes capable of locating DNA fragments containing a particular VNTR. The membrane is immersed in a solution containing the radioactive probes which will match up with and bind themselves to DNA fragments containing the complementary sequence of bases. Finally, the membrane is washed to remove any unbound probe.

In step 6, "autoradiography," the position of the probes on the membrane is visualized. This is accomplished by placing the membrane in contact with an X-ray film. Because the probes contain a radioactive molecule, the probe exposes the X-ray film at the exact location of the hybridized DNA fragments. When the X-ray film is developed, the locations of the fragments appear as lines on the film. The resulting print, called an autoradiogram or autorad, allows an analyst to see physically the results of the DNA profile in the form of bands on the print. Because individuals differ in terms of the length of their polymorphic DNA fragments, individuals tend to differ in the position of their bands on the DNA print.

After the RFLP procedure is completed, the results are inter-

preted. Interpretation involves the comparison of DNA band patterns on autorads from known and unknown samples. The interpreter makes a visual comparison and declares either that it is likely that the samples came from an identical source, that they did not come from an identical source, or that the comparison is inconclusive. If the unknown sample is not excluded, a computerized measurement program compares the samples. If the bands fall within a predetermined range, the FBI declares that the unknown DNA sample and the known DNA sample "match."

When the interpretation has excluded the unknown sample, the exclusion is deemed absolute and no further inquiry is made. If a match has been declared, an additional procedure is employed to determine the statistical significance of the match. The FBI employs population genetics principles to determine a probability frequency estimate based on a sample population. This estimate indicates the likelihood that a random sample of DNA selected from an ethnic population would match the known sample.

The FBI typically uses four independent probes in its RFLP procedure. In order for any DNA samples to be declared matches, there must be matches on all of the probes or else the samples are declared exclusions. Once a match is declared, the FBI uses an ethnically compatible sample population to establish a frequency estimate for each probe. This process involves a conservative "binning" method which tends to understate the relative rarity of each matching probe. Because the probes are deemed to be independent of each other, they serve as the basis for aggregate probability estimates using statistical techniques such as the product rule whereby the individual frequencies are multiplied together to determine the ultimate frequency of the pattern, *e.g.*, figuring the frequency of a royal flush in poker.

## DNA TESTING—LEGAL STANDARD

In its memorandum of decision, the trial court stated that a hearing was required when a party sought to admit novel scientific evidence. The trial court found that DNA evidence was novel scientific evidence and noted that the standard for the admission of such evidence was stated in *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013. *Frye* requires that, before novel scientific evidence can be admitted, the proponent of the evidence must show that "the thing from which deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (*Frye*, 293 F. at 1014.) Pursuant to the *Frye* standard, the trial court found that the hearing showed that the relevant scientific community generally accepted the reliability of the FBI's procedures

and protocol to determine both the existence of a DNA match and a probability estimate of the relative rarity of the particular aggregate DNA profile in the Caucasian population.

Despite the trial court's finding, defendant contends that the trial court erred in admitting the DNA evidence. On appeal, defendant essentially concedes that the FBI's RFLP procedures and concomitant probability estimates meet the *Frye* standard. However, defendant argues that the *Frye* standard alone is not sufficient to determine the admissibility of such complex evidence when it may have an extremely prejudicial impact on a jury. Defendant asserts that a more appropriate standard for the admission of DNA evidence would require that the proponent of DNA evidence not only satisfy the *Frye* standard, but also establish the reliability of the particular evidence by showing that the DNA tester in each case actually performed accepted scientific procedures in analyzing the forensic samples in question. Defendant notes that the leading case holding that more than the *Frye* test is required for the admission of DNA evidence is *People v. Castro* (1989), 144 Misc. 2d 956, 545 N.Y.S.2d 985. Defendant maintains that some Federal courts and several State appellate courts have followed the *Castro* approach. Finally, defendant argues that if the *Castro* approach was applied to this case, the trial court should have excluded the DNA evidence because of improper testing by the FBI.

The State replies that the standard for the admission of novel scientific evidence in Illinois is simply the *Frye* standard and nothing else is required. In addition, the State questions the authority of *Castro*. Finally, the State argues that even if the *Castro* standard was applied to this case, the DNA evidence here would be properly admitted.

In Illinois, our supreme court has consistently held that the standard for evaluating the admissibility of novel scientific evidence is the *Frye* standard. (*People v. Eyler* (1989), 133 Ill. 2d 173, 211, *cert. denied* (1990), 498 U.S. 881, 112 L. Ed. 2d 174, 111 S. Ct. 215.) Two recent appellate court opinions, *People v. Lipscomb* (1991), 215 Ill. App. 3d 413, and *People v. Miles* (1991), 217 Ill. App. 3d 393, determined that the *Frye* standard applies to DNA evidence. Moreover, *Lipscomb* specifically held that DNA evidence:

> "[I]s generally accepted within the particular scientific fields involved and is admissible. This includes the six-step RFLP procedure used in developing the autorads, the visual interpretation of these autorads, the manner of determining the bins, the development of frequencies, and [the] procedure whereby the individual frequencies are multiplied together to determine the ultimate frequency of the pattern.

Any question concerning the specific procedures used by the company or expert goes to the reliability of the evidence and is properly considered by the jury in determining what weight to give to this evidence. If it is shown that the procedures used give an unreliable result, then the court may find it necessary to exclude this evidence entirely." *Lipscomb*, 215 Ill. App. 3d at 432.

Despite this clear holding that the *Frye* standard alone applies to DNA evidence, defendant urges us to adopt the *Castro* standard. The *Castro* court acknowledged that other courts relied on the *Frye* standard alone in determining the admissibility of DNA evidence, but concluded that the complexity of DNA evidence and its potential impact on the jury made the *Frye* standard insufficient by itself "to place this type of evidence before a jury without a preliminary, critical examination of the actual testing procedures performed in a particular case." *Castro*, 144 Misc. 2d at ___, 545 N.Y.S.2d at 987.

■ We decline to follow *Castro* and instead adhere to the *Frye* standard with respect to the admission of DNA evidence as expressed by *Lipscomb*. In the first place, we are bound to follow this precedent. (*Maki v. Frelk* (1968), 40 Ill. 2d 193, 196-97; *People v. Kneller* (1991), 219 Ill. App. 3d 834, 841.) In addition, we agree with the reasoning expressed by the United States Court of Appeals in *United States v. Jakobetz* (2d Cir. 1992), 955 F.2d 786, when it declined to follow *Castro*. After noting the special challenges presented by DNA evidence, the *Jakobetz* court concluded that these difficulties were not so great as to require a new standard of admissibility which would diminish the fact-finding function of the jury. (*Jakobetz*, 955 F.2d at 796.) The role of the court should focus on the admissibility of a particular type of scientific evidence and allow the jury to discharge its duties of weighing the evidence, making credibility determinations, and ultimately deciding the facts. (955 F.2d at 797.) A jury is capable of properly weighing DNA evidence and is unlikely to be swayed or dazzled by statistical evidence, including probability estimates, to the point that it ignores evidence showing a tester failed to follow proper procedures in developing the evidence. 955 F.2d at 797.

For all these reasons, we conclude that the trial court applied the correct standard in determining whether to admit DNA evidence. After an extensive hearing, the trial court found that a preponderance of the evidence showed that the FBI's procedures in both developing and interpreting autorads and in calculating probability estimates were generally accepted by the relevant scientific community.

We will not disturb a trial court's determination to admit evidence pursuant to the *Frye* standard absent an abuse of discretion. (*Eyler*, 133 Ill. 2d at 211-12.) The factors raised by the defendant do

not support a determination that the trial court abused its discretion in this regard. Accordingly, we find that the trial court did not err in admitting the DNA evidence in this case. This includes both the evidence related to the development and interpretation of the autorads, and the probability estimates.

## SUFFICIENCY OF THE EVIDENCE

The next issue raised on appeal is whether defendant was proven guilty beyond a reasonable doubt. Defendant contends that the State has failed to produce sufficient evidence to tie defendant to the murder. Defendant argues that the State's case was based entirely on circumstantial evidence too tenuous to prove defendant guilty of murder. Defendant asserts that the evidence merely consisted of unsupported insinuations which failed to connect defendant to Burns and two items, the shoeprint found at the scene of the crime and the bloodstain found on the driver's seat of defendant's truck.

Defendant argues that the shoeprint was insufficient to place defendant at the scene of the crime because the shoeprint was not recovered by a shoeprint specialist, a matching shoe was not recovered from defendant, any testimony linking a possible matching shoe to defendant was inconclusive, and the State did not produce evidence that the shoeprint had unique characteristics.

Defendant acknowledges that DNA testing has made blood comparisons a more powerful means of establishing identity than in the past. However, defendant argues that problems with DNA testing have reduced the potential probative value of such evidence. In addition, defendant argues that the State's explanation of how the blood may have gotten on the truck seat was irrational.

Our supreme court recently set out the standard of review for appeals based on the alleged insufficiency of the evidence:

"When faced with a challenge to the sufficiency of the evidence, the relevant inquiry for the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261; see also *People v. Pintos* (1989), 133 Ill. 2d 286; *People v. Campbell* (1992), 146 Ill. 2d 363.) The reviewing courts apply this standard regardless of whether the evidence is direct or circumstantial. (*Pintos*, 133 Ill. 2d at 291; see also *People v. Eyler* (1989), 133 Ill. 2d 173, 191.) This standard of review does not allow the appellate court to 'substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses [citation].' " *People v. Sutherland* (1992), 155 Ill. 2d 1, 17.

The evidence in this case, when viewed in the light most favorable to the prosecution, establishes that defendant and Burns knew each other, sometimes attended the same AA meetings, and on the night of the murder came into the Kishwaukee Tap together where they drank for several hours. While in the tavern, defendant acted strangely and twice aggressively encountered regular tavern patrons.

The evidence also establishes that defendant was driving the 1970 Chevy pickup truck on the night of the murder. Although defendant and Burns did not leave the tavern at exactly the same time, Burns told Sam Carter that he was riding with someone who fits defendant's description.

When first interviewed by police, defendant admitted knowing Burns but denied being in the Kishwaukee Tap on the night of the murder. Defendant also failed to mention that he sometimes used the pickup truck to drive himself to AA meetings. When police recovered defendant's diary, there were no entries for the period from the day before the murder until more than two weeks after the murder and 12 pages were missing from the diary.

When police recovered the pickup truck, they found several incriminating evidentiary facts in the truck. First, the tire iron was missing from the jack set. There also was a tiny spot of human blood on the brake pedal. In addition there was a blue-tinted contact lens which matched the prescription of Burns' missing lenses although there are over 83,000 possible prescriptions within the normal range of lens prescriptions. The lens, like Burns' lens, was manufactured by one of only two area manufacturers supplying such lenses. Finally, police found a bloodstain matching Burns' blood on the driver's seat.

At the scene of the crime, there was much spattering of blood. However, the perpetrator would not necessarily have been heavily spattered.

Also at the crime scene, police found a number of bloody partial shoeprints which they were able to use to construct a shoeprint overlay. The overlay showed that the shoeprints were made by a size 11 to 12 Converse leather basketball shoe, either high or low top. One of the Kishwaukee Tap patrons who had a lengthy conversation with defendant while he was in the tavern on the night of the murder remembered telling police that defendant wore low cut Converse basketball shoes on that night.

The State contends that the totality of this circumstantial evidence is sufficient to convict defendant of murder beyond a reasonable doubt. Our supreme court has recently set out the guidelines for determining whether circumstantial evidence is sufficient to sustain a criminal conviction.

" 'Circumstantial evidence is the proof of facts or circumstances which gives rise to a reasonable inference of other facts which tend to establish the guilt or innocence of a defendant.' [Citations.] Circumstantial evidence is sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged. [Citation.]

'It is not necessary, however, that the jury be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all the evidence taken together satisfies the jury beyond a reasonable doubt of the accused's guilt.' [Citation.] Further, in weighing evidence, the trier of fact is not required to disregard inferences which flow normally from evidence before it [citation], nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt [citation].

*** Further, where the evidence presented is capable of producing conflicting inferences, the matter is best left to the trier of fact for proper resolution. [Citation.]" *People v. Campbell* (1992), 146 Ill. 2d 363, 379-80.

Defendant specifically objects to unsupported insinuations. Defendant apparently refers to the testimony tending to connect him with Burns. However, where the evidence is capable of producing conflicting inferences, such as whether defendant and Burns were in the Kishwaukee Tap together, we will leave the resolution of the matter to the fact finder. Here, the jury certainly could have inferred from the evidence that defendant and Burns were together in the tavern.

Defendant also argues there is no evidence to place him at the scene of the crime. Defendant tries to discount the bloody shoeprints. However, shoeprint evidence is generally reliable. (*Campbell*, 146 Ill. 2d at 378.) Although mere general characteristics of shoeprints, such as size, style, and brand name are seldom sufficient for identification purposes, they may give rise to reasonable inferences which tend to establish guilt or innocence. (146 Ill. 2d at 378-79.) The weight to be given to shoeprint evidence varies with three factors: (1) whether the shoeprints were found at or near the place of the crime; (2) whether the shoeprints were made at the time of the crime; and (3) whether the shoeprints correspond to shoes worn by the accused at the time of the crime. 146 Ill. 2d at 381.

Here, the shoeprints were certainly found at the scene of the crime. The fact that the shoeprints were made in the victim's blood allows an inference that they were made at the time of the crime. Finally, there is evidence that on the night of the murder defendant wore shoes matching the general characteristics of the shoes which

made the shoeprints found at the scene of the crime. Moreover, the jury could infer from the small spot of human blood on the brake pedal on the truck that defendant's shoes were bloody and transferred blood to the brake pedal.

With respect to the DNA testing evidence, the jury heard the testimony of four expert witnesses. Each of the witnesses was vigorously cross-examined. Based on this testimony, the jury could decide how much weight to give to the DNA evidence. The jury could have concluded from the bloodstain on the truck seat that defendant transferred the blood from the scene of the crime to the truck.

Defendant did not specifically discuss the contact lens found in the truck. However, the jury could have inferred that the lens indicated either that Burns had been in the truck and had lost the contact lens while in the truck or that defendant, perhaps unknowingly, transferred the lens from the scene of the crime to the truck.

Based on the totality of the evidence when viewed in the light most favorable to the prosecution, we conclude that the jury in this case could have found the essential elements of murder beyond a reasonable doubt. Although we might have weighed the evidence differently, we cannot say that the evidence was so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. We find therefore that a rational trier of fact could have inferred from the totality of the evidence that defendant was guilty beyond a reasonable doubt.

## JURY SELECTION

Defendant next contends that the trial court erred when it refused defendant's challenge for cause of a prospective juror. After defendant exhausted his 10 peremptory challenges, William Maschke, juror number 123, was the venireperson called to fill the twelfth and last spot on the jury. Defense counsel's initial examination of Maschke revealed that Maschke: was a 19-year veteran Rockford police department (RPD) police officer assigned to traffic accident investigation; knew defendant's attorney, Altamore, "through numerous court sessions" in traffic or DUI court over a period of years; and knew each of the RPD police officers listed to be called as witnesses. Maschke testified that he was "not very socially involved" with any of the officers on the list, although he saw them infrequently at union gatherings. Maschke further testified that he would have no problem judging the testimony of the officers, would not feel uncomfortable sitting on a jury as a police officer, and would not feel uncomfortable facing fellow police officers if the jury rendered a not guilty verdict in this case.

In the judge's chambers, defendant expressed a general concern to the trial judge about Maschke as a juror and specific concerns about the possibility that Maschke worked with officers in another investigation which was the subject of a motion *in limine*. During the oral argument about defendant's concerns, the trial judge learned that defendant was out of peremptory challenges. Defendant motioned to excuse Maschke for cause. Defendant argued that the trial court should excuse Maschke in the interest of justice and expressed fears that having a member of the RPD on the jury in a case where other members of the RPD would testify might intimidate other jurors or inhibit their feelings about the credibility of police officer witnesses and thereby deny defendant a fair trial. The trial judge denied defendant's motion to excuse Maschke for cause.

Defendant then questioned Maschke in the judge's chambers. Defendant read a list of the RPD officers who were involved in the investigation which was the subject of the motion *in limine*. Maschke testified that one of the police officers on the list was his brother-in-law. However, Maschke testified that he would judge his brother-in-law the same as anyone who walked in off the street. Maschke also testified that he had briefly worked together as a partner with Detective Forrester, one of the RPD officers who actually testified as a witness in the case. When they were partners, Forrester was a senior officer and Maschke was new on the RPD. Maschke testified that he would not find it difficult to judge Forrester despite having worked with him as a partner. At that point, defendant renewed his motion to excuse Maschke for cause. The trial court again denied the motion.

On appeal, defendant contends that under *Marcin v. Kipfer* (1983), 117 Ill. App. 3d 1065, *People v. Gaston* (1984), 125 Ill. App. 3d 7, and *People v. Green* (1990), 199 Ill. App. 3d 927, Maschke's status as a RPD employee and his close relationship to other RPD employees, some of whom testified at trial, resulted in prejudice to defendant and denied him a fair trial. The State responds that these cases are not persuasive.

In *Marcin*, questioning during *voir dire* revealed that two potential jurors were patients of the defendant doctor in a medical malpractice case. The reviewing court held that it was reversible error for the trial court to refuse plaintiff's challenge for cause of the two jurors. The court based its decision on the closeness of the relationship between the jurors and the defendant. Here, defendant argues that Maschke's relationship with the police officers who testified at trial was sufficiently close to require the trial court to grant defendant's challenge for cause.

In *Gaston*, the trial court learned in a post-trial motion that one of the jurors had failed to disclose that he was a part-time police officer. The trial judge concluded that the juror had not been "terribly biased" and denied the motion for a new trial. The reviewing court stressed that the juror's mere status as a part-time police officer did not require excusing the juror. However, the court remanded the case for a hearing to determine whether the juror was in fact biased. The court indicated that relevant factors in determining whether a police officer is likely to be a biased juror included: whether the juror is on the same police force as police officer witnesses in the trial; the length of the juror's employment and the scope of his duties; how the juror was specifically biased because of his duties as a police officer; whether the outcome of the case hinged on the testimony of police officers at the trial; and whether the alleged offense was directed at a police officer. (*Gaston*, 125 Ill. App. 3d at 10.) Here, defendant argues that applying these factors to the circumstances of this case shows that Maschke was likely to be a biased juror and therefore the trial court should have granted defendant's challenge for cause.

In *Green*, a prospective juror testified during *voir dire* that she could be a fair and impartial juror in a criminal trial despite the fact that she was employed as a secretary in the State's Attorney's office. On appeal, the court determined that defendant had failed to preserve the issue of trial court error in denying defendant's challenge to the juror for cause. Nonetheless, the court indicated that, had the issue been preserved, it would have reversed defendant's conviction and remanded for a new trial because " '[t]he trend of authority is to exclude from juries all persons who by reason of their business or social relations, past or present, *** could be suspected of possible bias.' " (*Green*, 199 Ill. App. 3d at 930, quoting *Marcin*, 117 Ill. App. 3d at 1068.) Here, defendant argues that Maschke's employment as a police officer and his relations with police-officer witnesses requires that he be excluded because of possible bias.

The State responds that *Marcin* has been weakened by a subsequent opinion, *People v. Cobb* (1989), 189 Ill. App. 3d 86 (trial court properly refused defendant's challenge for cause of juror whose son was assistant State's Attorney in charge of felony prosecutions but not directly involved in felony trial and did not appear in court). The State also contends that *Gaston* actually supports the State's position because the court there stressed that mere status as a police officer did not require excusing the juror. Finally, the State asserts that *Green* is not very persuasive because that court's comments about reversing the trial court were mere *dicta*.

The constitutional right to a jury trial guarantees to a criminal

defendant a fair trial by an impartial jury, and the failure to provide a criminal defendant a fair trial violates the minimal standards of due process. (*Turner v. Louisiana* (1965), 379 U.S. 466, 471-72, 13 L. Ed. 2d 424, 428, 85 S. Ct. 546, 549.) The improper denial of a challenge for cause regarding the impartiality of a juror requires that a reviewing court reverse the defendant's conviction and grant the defendant a new trial. (*People v. Taylor* (1984), 101 Ill. 2d 377, 387.) The impartiality of a juror is not an objective conception; rather, it is a state of mind. *People v. Cole* (1973), 54 Ill. 2d 401, 413.

The trial court has broad discretion to determine whether a prospective juror possesses an impartial state of mind, and this determination will not be set aside unless it is against the manifest weight of the evidence. (*Cole*, 54 Ill. 2d at 414.) A prospective juror's statements are proper evidence for the court to consider and weigh as to the juror's state of mind. 54 Ill. 2d at 414.

Despite the trial court's great discretion and the weight to be given a juror's statements under oath that he can lay aside matters that might indicate bias and render an impartial verdict, "the relationship of a prospective juror to a party can be so close that, considering the nature of the case, fairness requires that the juror be discharged." (*Marcin*, 117 Ill. App. 3d at 1067.) The mere fact that a prospective juror is a police officer is not enough to automatically require allowing a challenge for cause in a criminal case. (*People v. Jones* (1987), 162 Ill. App. 3d 487, 493.) However, if a police officer has a close relationship to a case he should be excluded from serving on a criminal jury. *Commonwealth v. Jones* (1978), 477 Pa. 164, 168, 383 A.2d 874, 877.

Where the prospective juror is a member of the same police department as the officers testifying in the case, knows the testifying officers, and the outcome of the case hinges on the credibility of the testifying officers, the juror's relationship to the case is so close as to require that the juror be excused from the jury. *Commonwealth v. Jones* (1978), 477 Pa. 164, 169, 383 A.2d 874, 877; see also *People v. Gaston* (1984), 125 Ill. App. 3d 7, 10.

■ Here, we determine that Maschke's relationship to the case was so close that the trial court should have excused Maschke upon defendant's challenge for cause. Maschke was a 19-year veteran police officer of the RPD and 11 of the police officers who testified at the trial were RPD officers. Maschke knew all 11 of the RPD police officers that testified. Several important pieces of evidence in this case involved the credibility of witnesses with the jury obliged to determine whether civilian witnesses were more credible than police witnesses. In particular, the State called Detective Forrester,

Maschke's former partner, to impeach and/or rebut the testimony of civilian witnesses Faber, Menzel, and McNamara. The outcome of the case could have hinged on the credibility of Forrester's testimony. Because Maschke served as the jury foreman, he could have had a disproportionate influence on his fellow jurors in this regard. (*Gaston*, 125 Ill. App. 3d at 11.) Where, as here, the jury might have reasonably returned a verdict for either party, it is more difficult to say that a potential improper influence did not affect the verdict. *Campbell v. Fox* (1986), 113 Ill. 2d 354, 359.

Under the facts of this case, we believe the trial court erred in refusing defendant's challenge for cause with respect to Maschke's impartiality. We hold that, on this record, the trial court's determination of impartiality was against the manifest weight of the evidence. Accordingly, we reverse defendant's conviction and grant defendant a new trial.

## IMPEACHMENT

Defendant next contends that the trial court erred when it allowed the State to present the testimony of a police detective to impeach three of its own witnesses with prior inconsistent statements. Defendant also contends that the State improperly used the impeachment to present the prior inconsistent statements as substantive evidence. Defendant further asserts that references to the impeachment by the State in its closing argument increased the prejudice to defendant.

The first witness was Lisa Faber, one of the bartenders at the Kishwaukee Tap on the night of the murder. At trial, Faber testified that Burns and defendant were in the bar that night but she could no longer remember whether they had come in together or whether they sat together for 30 to 45 minutes at the bar. Upon being shown a police report of the answers she gave police during an interview on April 20, 1990, Faber recalled that she had told police that Burns and the defendant came into the bar together. Faber could not remember telling the police that Burns and defendant sat together at the bar. After the trial court overruled defendant's hearsay objection, Detective Forrester subsequently testified that Faber stated during the police interview that Burns and defendant came into the bar together and sat together at the end of the bar for 30 to 45 minutes and drank beer.

The second witness was Mark McNamara, a patron in the Kishwaukee Tap on the night of the murder who had talked to defendant in the bar. At the trial, McNamara testified that defendant was wearing tennis shoes on that night, but did not remember what kind

of tennis shoes. After being asked whether he recalled telling Detective Forrester that the defendant's shoes were "Converse tennis shoes because they had a star on the side," McNamara replied that he remembered making that statement to the police. Subsequently, after the trial court overruled defendant's improper impeachment objection, Detective Forrester testified that he had interviewed McNamara on April 20, 1990, and that McNamara had stated that defendant was wearing white low cut tennis shoes in the tavern that night and he believed they were Converse because he saw a star on the side of the shoes. Detective Forrester also testified that neither he nor the other detective present during the interview prompted McNamara for the information.

The third witness was Cindy Menzel, a restaurant waitress who knew defendant because defendant and his mother came into the restaurant nearly every day. At the trial, Menzel testified that she did not remember telling police that defendant had a pair of high top leather Converse tennis shoes and wore them almost daily until about a week before Menzel talked to the police. Menzel also did not remember telling the police she thought that defendant had missed coming into the restaurant on two specific dates, April 3 and April 4, 1990. Subsequently, after the trial court overruled defendant's hearsay objection, Detective Forrester testified that he and another detective interviewed Menzel on April 24, 1990, and that Menzel had stated during the interview that defendant wore a pair of white leather high top Converse shoes almost daily until about a week before the interview. Detective Forrester also testified that Menzel had stated in the interview that defendant missed coming into the restaurant on April 3 and April 4, 1990.

In its closing argument, the State said that at trial McNamara was unable to recall what kind of shoes defendant wore at the Kishwaukee Tap, but did remember telling police they were Converse shoes. The State also implied that Menzel may not have been telling the whole truth at the trial.

Defendant first contends that the State's impeachment of Faber, McNamara, and Menzel was improper because the testimony of these witnesses did not meet the requirements for such impeachment under Supreme Court Rule 238 (134 Ill. 2d R. 238). In addition, defendant asserts that the impeachment was improper because the State failed to meet the specific statutory requirements for substantive use of the impeaching statements.

The State responds that the trial court properly admitted the impeachment testimony as substantive evidence under section 115— 10.1 of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat.

1991, ch. 38, par. 115—10.1 (now codified as 725 ILCS 5/115—10.1 (West 1992))). The State also asserts that the impeachment testimony met the Rule 238 requirement that the testimony damage the impeaching party. Finally, the State argues that even if there was error in admitting the impeaching testimony the error was harmless.

Under Supreme Court Rule 238, a party may only impeach its own witness when the witness' testimony damages the position of the party that put the witness on the stand. The reason for this is simple: No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury. Impeachment is not normally substantive evidence and its sole purpose is to cancel out the witness' testimony. It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful. See *People v. Weaver* (1982), 92 Ill. 2d 545, 563-64; see also *People v. Bradford* (1985), 106 Ill. 2d 492, 500; *People v. Johnson* (1985), 138 Ill. App. 3d 980, 985.

■ Here the statements in question were *not* clearly damaging to the State. The State needed Faber's statements to link the victim and defendant together at the bar. However, the failure to remember a particular fact that would have benefited the State's case is neither damaging nor beneficial; it is inconclusive. When the State sought to enter the prior inconsistent statement as impeachment, it attempted to prove the truth of the impeachment rather than reduce the credibility of the particular witness. There is a danger that juries may consider the nonsubstantive impeaching evidence as substantive evidence of the truth of what is asserted in that impeaching testimony. *Bradford*, 106 Ill. 2d at 500.

Upon retrial, under Rule 238, the trial court should consider if the proponent (the State in this case) is attempting to impeach the credibility of its own witness or is attempting to merely submit the nonsubstantive prior inconsistent statement for substantive purposes. (134 Ill. 2d R. 238.) Assuming *arguendo* the State was damaged, impeachment could have been properly perfected by having the officer testify that the witness in fact gave a different statement without revealing the details of that statement. In conclusion, the prior inconsistent, nonsubstantive statements were not proper statements for impeachment under Rule 238. However, that does not necessarily mean that the prior inconsistent, substantive statements were inadmissible under section 115—10.1.

Ordinarily, a party may only use a prior inconsistent statement for purposes of impeachment. (*People v. Sullivan* (1992), 234 Ill. App. 3d 328, 332.) However, under section 115—10.1 of the Code, a party

may use prior inconsistent statements as substantive evidence when the witness, subject to cross- examination, acknowledges under oath the making of the statement. Ill. Rev. Stat. 1991, ch. 38, pars. 115—10.1(b), (c)(2)(B) (now 725 ILCS 5/115—10.1(b), (c)(2)(B) (West 1992)).

Defendant concedes that the statements were inconsistent and that the witnesses were subject to cross-examination. Thus, the question before us is whether the witnesses acknowledged under oath the making of the impeaching statements.

Here, Faber during her direct testimony acknowledged that she had made the statement in the police report that Burns and defendant came into the bar together. However, Faber could *not* recall that she had told police that Burns and defendant sat together at the bar for 30 to 45 minutes. During his direct testimony, McNamara acknowledged making the statement in the police report that defendant's shoes were Converse tennis shoes and that he knew this because of the star on the side of the shoes. Menzel did not acknowledge making the impeaching statements about defendant's shoes or defendant not coming into the restaurant on certain days.

Accordingly, the only statements the State could use as substantive evidence under section 115—10.1 of the Code were Faber's statement about Burns and defendant coming into the bar together and McNamara's statement. The State could not use Faber's statement that Burns and defendant sat together in the bar and Menzel's statements because they could be used only for impeachment and not as substantive evidence. Only the substantive impeachment is admissible pursuant to section 115—10.1. Upon retrial any impeachment may only be used in conformity with Rule 238 or section 115—10.1 as interpreted in this opinion, assuming the responses of the witnesses remain the same.

## PHOTOGRAPHS

The next issue is whether the trial court's decision to allow certain photographs to go to the jury during deliberations deprived defendant of a fair trial. Two sets of photographs are in question. One set of photographs showed the victim's body as it was found at the scene of the crime. The other set of photographs showed the victim's corpse during the autopsy.

Defendant argues that the photographs served only to prejudice and inflame the jury because they were cumulative and not probative of any issue. The State responds that the photographs were probative of several issues including: the probable type of murder weapon, the mental state of the killer, and a defense theory that the victim was pistol whipped.

Our supreme court set out the general principles regarding the admissibility of photographs showing the condition of a murder victim in *People v. Jenko* (1951), 410 Ill. 478:

"The fact and cause of death, the number and location of the wounds, the manner in which they were inflicted, and the wilfulness of the acts in question are all material to the offense charged. \*\*\* Evidence having a natural tendency to establish the facts in controversy should be admitted. A party cannot have competent evidence excluded merely because it might arouse feelings of horror and indignation in the jury. Any testimony concerning the details of a murder or other violent crime may have such tendencies, but manifestly this could not suffice to render it incompetent. Of course, where spectacular exhibits having little probative value are offered for the principal purpose of arousing prejudicial emotions they should be promptly excluded. But questions relating to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the trial judge, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant." *Jenko*, 410 Ill. at 482.

■ Here, the photographs tended to prove the nature and extent of the injuries, the condition and location of the body, the likely type of murder weapon, blood spattering (see *People v. Henderson* (1990), 142 Ill. 2d 258, 320) and corroborated and explained the medical examiner's testimony (*People v. Cardona* (1992), 240 Ill. App. 3d 110, 118). Because the photographs were probative of these issues, we find that the trial court did not abuse its discretion by allowing the photographs to go to the jury.

Based on the foregoing, the judgment of the circuit court of Winnebago County is reversed, and the cause is remanded for proceedings consistent with this opinion.

Reversed and remanded.

INGLIS, P.J., and WOODWARD, J., concur.