CHANDLER, J.,
for the Court.
. ¶ 1. Todd Randall Trower was indicted for the crimes of capital rape, burglary of a dwelling and kidnaping. On July 26, 2001, guilty verdicts were, returned by the jury on each count in the indictment. Trower was sentenced, to the Mississippi Department of Corrections for a period of twenty-five years for capital rape, twenty-five years for burglary of a dwelling and life imprisonment for the kidnaping charge. Feeling aggrieved, Trower -appeals the following errors:.
I. THE TRIAL COURT ERRED WHEN IT REFUSED TO IN *1044 STRUCT THE JURY REGARDING CIRCUMSTANTIAL EVIDENCE.
II. THE TRIAL COURT ERRED BY ALLOWING THE INTRODUCTION OF A PIECE OF DUCT TAPE DESPITE NO SHOWING OF RELEVANCE WAS EVER MADE BY THE STATE AND THE COURT FAILED TO MAKE A BALANCING TEST UNDER RULE 403.
III. THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
IV. PROSECUTORIAL MISCONDUCT RESULTED IN THE DENIAL OF THE DEFENDANT’S FUNDAMENTAL RIGHT TO A FAIR TRIAL
V. THE CUMULATIVE EFFECT OF THE ERRORS REQUIRE REVERSAL OF THE VERDICT.
¶ 2. Finding merit in Trower’s claim that he was entitled to a jury instruction regarding circumstantial evidence, we reverse and remand to the trial court for proceedings pertaining to that issue.
FACTS
¶ 3. During the early morning hours of February 23, 1998, five year old Jane Doe was abducted from her home while she was asleep on the couch. She was later dropped off in the rain by her abductor at a Wal-Mart parking lot as the store was opening. Store employees noticed the child wandering aimlessly around the parking lot crying. The police department was summoned and Jane Doe told the police that a “mean man named Dan” took her from her house and bound her hands to the spindle of a headboard with duct tape.
¶ 4. The police searched the Wal-Mart parking lot and discovered a piece of duct tape in the vicinity of the area from which the child came. After replacing Jane Doe’s wet clothes, the police transported her to a hospital where tests were performed that showed she had been sexually assaulted. Jane Doe’s mother was called and informed, much to her surprise, that her child was found in a Wal-Mart parking lot.
¶ 5. Jane Doe gave a description of her abductor to the police and a composite of the man was made. The initial description given of her attacker was that he had blond hair, wore church clothes and wore a green and brown hunting style cap. Jane Doe told the police that the abductor’s car was very clean and it was white with a blue interior and it had four doors. Jane Doe said that she was taken to the abductor’s house where her hands were tied with duct tape to a spindled headboard. She said that the culprit’s house was white and she was able to draw a picture of it for the police. Jane Doe also described various appliances and furniture that were contained within the house.
¶ 6. The following week the police received a telephone call from Dan McDan-iels inquiring as to the status of the Jane Doe case and offering his assistance. The police considered this suspicious and began investigating him. Many of Jane Doe’s statements to the police matched the description of Dan McDaniels. He was later arrested, but the charges were eventually dropped after DNA evidence positively excluded him as the suspected culprit.
¶ 7. Approximately three weeks after Jane Doe’s abduction, Todd Randall Trow-er was arrested on an unrelated charge. Trower’s facial features were strikingly similar to the composite picture the police had compiled based on Jane Doe’s description. The police searched Trower’s house *1045 and discovered the house contained many of the same items that Jane Doe had described. Upon entering Trower’s bedroom, the police discovered a piece of duct tape stuck to a spindle on the headboard. With the evidence obtained from the search, the authorities requested and obtained a male sexual assault kit from Trower.
¶ 8. The blood and tissue samples taken from Trower were sent to the Mississippi Crime Lab for DNA testing. The Mississippi Crime Lab, at the time, was only capable of testing seven genetic markers. The preliminary profile of the abductor fit Trower; however, the Mississippi Crime Lab could only assign a one in four probability that Trower was the perpetrator of the crime. Trower’s samples were then sent to Reliagene, a private DNA lab located in New Orleans, Louisiana, for further genetic marker testing.
¶ 9. Reliagene determined that Trower was the likely perpetrator of the crime. The DNA yielded from the victim was a mixed sample which contained the DNA of both Jane Doe and Trower. A mixed sample occurs where there is a spill over from the female fraction into the male fraction of DNA.
¶ 10. In other words, there is not a hundred percent separation of the male and female DNA. Reliagene scientists reached a conclusion from the DNA results by comparing Trower’s known DNA profile to the sperm cell fraction DNA taken from Jane Doe. Each marker of the DNA was tested and Trower could not be excluded as having contributed to the mixture.
¶ 11. After determining that Trower could not be excluded from the DNA sample, a statistical analysis was then applied to the DNA. A statistical analysis of DNA can either be exclusive or inclusive. An exclusion probability sample takes the perpetrator’s DNA' and compares it to Caucasian, Black and Hispanic databases in order to determine how many people are excluded as having contributed to the profile. It was determined that ninety-nine point nine percent (99.9%) of the population could be excluded from the DNA sample. Yet, Trower could not be excluded from having contributed to the DNA sample yielded from Jane Doe. An inclusive statistical analysis was also used to tell how many people out of a certain population could have contributed to the DNA profile. It was determined that only one (1) • in six hundred ninety thousand (690,000) persons could be included in this particular sample. Therefore, one would have to look at six hundred ninety thousand (690,000) persons of the Caucasian race to find someone that coincidentally matched the DNA profile taken from the victim-.
¶ 12. Following a trial by jury, Trower was convicted of all three counts in the indictment. The trial judge denied Trow-er’s motions for a new trial, or in the alternative, a JNOV, and Trower appealed to this Court.
I. THE TRIAL COURT ERRED WHEN IT REFUSED TO IN- . STRUCT THE JURY REGARDING CIRCUMSTANTIAL EVIDENCE.
¶ 13. Trower alleges the trial court erred in its failure to grant a circumstantial jury instruction.- The State argued that the case against Trower was not circumstantial claiming DNA evidence is direct evidence. The circumstantial jury instruction at issue stated: “The court instructs the jury that if you can reconcile the evidence upon any reasonable hypothesis consistent with innocence of the accused; Todd Trower, you should do so and find him not guilty.” The trial judge took the jury instruction under advisement and later declined to grant the instruction *1046 holding that DNA evidence is direct evidence.
¶ 14. A circumstantial evidence instruction “must be given unless there is some type of direct evidence such as eyewitness testimony, dying declaration, or confession or admission of the accused.” Deal v. State, 589 So.2d 1257, 1260 (Miss.1991). “The rule in Mississippi is that a circumstantial evidence instruction should be given only when the prosecution can produce neither eyewitnesses or a confession to the offense charged.” Stringfellow v. State, 595 So.2d 1320, 1322 (Miss.1992). “Where all the evidence tending to prove the guilt of the defendant is circumstantial, the trial court must grant a jury instruction that every reasonable hypothesis other than that of guilt must be excluded in order to convict.” Henderson v. State, 453 So.2d 708, 710 (Miss.1984).
¶ 15. The State argues that DNA evidence is direct evidence without citing any case precedent to support its argument. The trial court based its refusal of the circumstantial jury instruction on the holding in the case of Whitlock v. State, 419 So.2d 200 (Miss.1982). In Whitlock, the victim positively identified the defendant as her attacker through voice, height and build, thereby, negating the need for a circumstantial jury instruction. Id. at 203. The Whitlock case does not hold that DNA is direct evidence. In Whitlock, the victim was robbed and raped by an intruder. Id. at 201. The defendant was charged with armed robbery and later denied a circumstantial jury instruction because “the prosecution relied upon both direct and circumstantial evidence. Mrs. Robinson was an eyewitness who identified Whitlock as the accused.” Id. at 204.
¶ 16. The court in Whitlock did not deny the defendant a circumstantial jury instruction based on DNA evidence. DNA evidence played no part in the resolution of the case against Whitlock. Nor did the court state in its holding that DNA evidence is to be considered direct evidence.
¶ 17. In Parker v. State, 606 So.2d 1132 (Miss.1992), the Mississippi Supreme Court held that it was reversible error for the trial court to refuse to grant a circumstantial jury instruction. In Parker, the victim was raped and murdered. A sexual assault kit was obtained from the victim which contained the DNA of two separate men. Id. at 1136. Forensic analysis determined that the DNA samples were deposited from two individuals that were non-secreters. Both Parker and the victim’s boyfriend were non-secreters. Id. at 1141. There was testimony at trial that the victim and her boyfriend had consensual sexual relations on the night of her death. Id.
¶ 18. Parker was convicted of the crime, but the Mississippi Supreme Court reversed his conviction because the evidence in the case, which was DNA, was “wholly circumstantial.” IcL at 1140. The court held that the evidence in the case was entirely circumstantial because it “required the jury to draw upon inferences and suspicious circumstances in order to return a conviction.” Id. at 1141.
¶ 19. In Hughes v. State, 735 So.2d 238, 248(¶ 15) (Miss.1999) the State built a “strong circumstantial case against the accused through the testimony of witnesses, the identification and location of items of physical evidence and the DNA evidence.” With regard to the DNA evidence, the court stated that the “frequency of [a] random occurrence, coupled with the non-statistical, circumstantial evidence of this case, makes it highly unlikely that another man besides Mr. Hughes is the match for the DNA found in the semen.” Id. at (¶ 116). Although convinced of the defendant’s guilt, the court clearly categorized the DNA evidence as circumstantial.
¶ 20. In a search of case law on the question of the nature of DNA evidence, *1047 it was determined that while some jurisdictions classify DNA evidence as direct evidence, more jurisdictions classify DNA evidence as circumstantial. For cases characterizing DNA evidence as circumstantial, see, for example, Thomas v. State, 824 So.2d 1, 35 (Ala.Cr.App.1999); People v. Groves, 854 P.2d 1310, 1315 (Colo.App.1992); Bedoya v. State, 779 So.2d 574, 577 (Fla. 5th DCA 2001); Greenway v. State, 207 Ga.App. 511, 428 S.E.2d 415, 416 (1993); People v. Stremmel, 258 Ill.App.3d 93, 630 N.E.2d 1301, 1307, 197 Ill.Dec. 177 (1994); Jones v. State, 780 N.E.2d 373, 376 (Ind.2002); State v. Spaeth, 552 N.W.2d 187, 192-93 (Minn.1996); State v. Fortin, 318 N.J.Super. 577, 602, 724 A.2d 818, 831 (App.Div.1999).
¶ 21. This Court is committed to following the case precedent of the Mississippi Supreme Court, although the DNA evidence overwhelmingly implicates Trower as the culprit of this crime. The case law of Mississippi treats DNA evidence as a type of circumstantial evidence. Therefore, Trower was entitled to a circumstantial jury instruction under Mississippi law. Finding this issue dispositive, we reverse and remand to the lower court for further proceedings.
¶ 22. THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY IS REVERSED AND REMANDED FOR A NEW TRIAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JACKSON COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, IRVING, MYERS AND GRIFFIS, JJ., CONCUR.