THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANGELO DALCOLLO, Defendant-Appellant.

Second District    No. 2—93—1291

Opinion filed August 19, 1996.—Rehearing denied September 12, 1996.

G. Joseph Weller, Patrick M. Carmody, and Sherry R. Silvern, all of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Diane L. Campbell, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

A jury convicted defendant, Angelo Dalcollo, of criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(1) (now 720 ILCS 5/12—13(a)(1) (West 1994))). The trial court sentenced defendant to nine years' imprisonment. Defendant now appeals his conviction. We affirm.

## BACKGROUND

On August 1, 1990, defendant was charged by complaint with the offense of criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(1)). Two weeks later defendant was indicted on that same offense. The indictment charged that on July 14, 1990, defendant, by use of force, committed an act of sexual penetration by inserting his penis into A.F.'s vagina.

Trial commenced on May 11, 1993, before Judge Frederick Kapala and lasted until May 17, 1993. The facts adduced at trial may be briefly stated. Additional pertinent facts will be discussed in the context of the issues raised on appeal. A.F., the complainant, testified that on July 14, 1990, at 3 a.m., she started to walk to the Penny Pincher Cafe (the cafe) in Rockford, Illinois, to meet some friends. After walking three miles, a red El Camino with a broken right headlight drove past her, turned around, and pulled alongside her. The driver of the vehicle, whom A.F. identified in court as defendant, offered her a ride, which she accepted. As they approached the cafe, defendant "punched the gas" and drove past it. Defendant drove to a parking lot and told A.F. that he was going to "make love to [her]." When A.F tried to open her door, defendant told her "not to make him do it the hard way," because if she did, "he'd hurt [her] really bad." A.F. asked him if he was afraid of "going up for rape," and he said he was not because "he'd gone up lots of times before and never got caught." Defendant then hit her in the head, jumped on top of her, and removed her pants. After ordering her to remove her tampon, he inserted his penis into her vagina and ejaculated. Defendant then let her leave the car. As he drove away, she memorized the license plate number. A.F. stated it was 14CC2E, although the record reveals that the number was actually 1422 CE. A.F. then walked to the cafe and told some police officers, who happened to be there, that she had been raped. The police officers took her to the hospital. At the hospital, A.F. told the nurse that she had been raped.

A.F. also testified that on July 16, 1990, she went with her husband, Debra Shumaker, and Gerald Anderson to defendant's home. A.F.'s husband apparently knew that defendant was her assailant based on her description of him and his vehicle. He therefore

wanted to "beat up" defendant. After their car got stuck in a ditch near defendant's home, a truck driven by defendant pulled up behind them. When defendant said something to them, A.F. turned around, pointed at him, and said, "He is the one that raped me." Defendant ran, but was caught and beaten by A.F.'s husband.

On cross-examination, A.F. stated that the distance from her home to the cafe was 8 to 10 miles. She stated that she touched the inside of the El Camino with her hands and that while inside the vehicle she tried to wipe off any fluids or menstrual blood on her. She admitted that she knew on July 20, 1990, that defendant had charged her with aggravated assault in relation to the July 16 incident. On redirect examination, A.F. testified that when she arrived at the cafe on July 14, 1990, she gave a description of her assailant to a police officer and told him that her assailant's vehicle was a red El Camino with a broken right headlight.

Officer Royal MacKenzie of the Rockford police department testified that at approximately 5 a.m., on July 14, 1990, A.F. approached him in the cafe and told him that she had been raped. Her blouse was torn and she was crying. She described her assailant and his vehicle, a red El Camino pickup truck with a broken headlight. She also provided the vehicle's license plate number. He then escorted her to SwedishAmerican Hospital.

Michelle Gillihan, a nurse at the hospital, testified that at approximately 5:45 a.m. on July 14, 1990, she met A.F., who told her that she had been raped. Gillihan then performed a rape test examination on A.F. She did not notice any bruises on A.F.

Detective Bruce Scott of the Rockford police department testified that on July 20, 1990, he impounded defendant's vehicle, a red El Camino. The vehicle's right headlight did not work. Detective Scott also stated that when he served the criminal complaint on defendant in this case, defendant said, "Yeah, but you can't fucking prove it." He acknowledged on cross-examination that when he impounded the vehicle, there was no indication that it had been recently cleaned.

Dr. Harold Deadman, supervisor of the Federal Bureau of Investigation's (FBI) DNA analysis unit, testified as an expert in forensic DNA analysis. According to Dr. Deadman, DNA (deoxyribonucleic acid) is a chemical substance present in the cellular material of all living things. Located in a body's chromosomes, DNA determines a person's characteristics. DNA is made of four types of subunits, which he described as being "like links in a chain." Although there are only four types of subunits, there are millions of individual subunits along the length of the chain. The sequence of the different subunits determines a person's characteristics. Except for identical twins, each person's DNA is unique.

Dr. Deadman testified that the DNA analysis unit examines evidence submitted in criminal cases by comparing the DNA extracted from an unknown source with DNA from a particular person. The unit attempts to identify an individual as being a contributor of a particular type of biological material, such as blood or seminal fluid. There are three general steps in DNA testing: (1) creating a DNA "profile" of a sample; (2) determining whether the profiles of different samples "match"; and (3) if the samples match, estimating the statistical probability of a random match.

The first step, creating a DNA "profile" of a sample, involves its own six-step process, known as "Restriction Fragment Length Polymorphism" (RFLP). Step 1 involves extracting the DNA from a sample. Step 2 involves cutting the extracted DNA into smaller fragments. The DNA is cut "by using chemical substances that subjects [sic] it to certain sequences that are present," thereby generating a large number of smaller fragments of DNA. In step 3, the DNA is separated by size. The DNA is placed in a gel; an electrical current is applied to the gel, forcing the DNA fragments to move according to their size. The larger fragments, which move more slowly, remain at the origin, while intermediate fragments spread throughout the gel. Once completed, the DNA fragments are arrayed across the gel according to their size. In step 4, the DNA fragments are transferred from the gel to a piece of nylon. When this is done properly, the fragments are arrayed on the nylon exactly as they existed in the gel. Step 5 involves using radioactively charged probes to identify, locate, and measure the DNA fragments of concern to the test. In step 6, the probes are "visualized." A piece of X-ray film is placed on top of the probe, revealing DNA "bands" (pieces of DNA). DNA bands make up the DNA profile.

The second step requires interpreting the results of the RFLP procedure. Interpretation involves comparing DNA bands from known and unknown samples. A comparison may be made by visually inspecting and then measuring the DNA bands of the known and unknown samples. A "match" exists if the bands are consistent. A match between a known and unknown sample is not an absolute identification. A match is only a statement of consistency. That is, a match is a statement that the DNA in the unknown sample could have originated from the source of the known sample.

The third step involves estimating the statistical probability of a random match. Because a match is only a statement that the DNA in the crime scene sample *could have* originated from the defendant, the FBI estimates the statistical probability of a random match between the DNA sample taken from the crime scene and the DNA

sample taken from the defendant. To do this, the FBI determines what part of the population would contain a DNA profile like that found in a particular case. In other words, the FBI estimates the frequency of the particular DNA test sample occurring in a population unit. In making this estimate, the FBI compares the DNA test samples to a previously constructed database. The FBI's databases are divided along racial lines. The Caucasian database, which was used in the present case, is a database of approximately 500 to 700 people, or between 1,000 and 1,500 DNA bands.

The FBI estimates the probability of a random match in the following manner. The bands in a particular category are added up and then divided by the total numbers of bands. The result is the "band frequency" for that population unit based on the FBI database. Once the frequencies of each probe are determined, they are multiplied together to determine the frequency of the DNA profile. This manner of multiplying the frequencies is known as the product rule. A more detailed explanation of the product rule may be found in *State v. Bible*, 175 Ariz. 549, 582-84, 858 P.2d 1152, 1185-86 (Ariz. 1993).

According to Dr. Deadman, the FBI's procedures have been criticized "primarily in the courtroom, by Defense experts in the courtroom." The FBI's procedures have not been criticized to any great extent at scientific conferences. Moreover, the scientific literature that deals with the issues of forensic DNA evidence is "almost overwhelmingly" in support of the FBI's procedures. Those publications that have criticized the FBI's procedures are "very few," and they use "very little supporting data" to support their criticisms.

Using the FBI's procedures, Dr. Deadman concluded, to a reasonable degree of scientific certainty, that defendant's DNA "matched" the DNA recovered from the seminal fluid found on the underwear A.F. wore at the time of the attack. Dr. Deadman calculated that the probability of a random match was 1 in 60 million.

On cross-examination, Dr. Deadman testified that the database used in the present case is used for the entire United States, but that it includes samples only from California, Texas, Florida, and FBI trainees. While there may be some differences between ethnic groups within a population, those differences are not "meaningful or significant." Dr. Deadman conceded that it would be possible to get a different result in this case if the samples comprising the database were drawn from Illinois and that using a different database could result in a different probability of a random match. Dr. Deadman also conceded that a report by the National Research Council, Committee on DNA Technology in Forensic Science, *DNA Technology in Forensic Science* (1992) (NRC Report), stated that "[q]uestions have been

raised about the adequacy of population data bases on which frequency estimates are based on the role of ratio and ethnic origin and frequency estimation."

The State rested at the conclusion of Dr. Deadman's testimony. In his own defense, defendant called Dr. Pravatchai Boonlayangoor to testify as an expert in forensic DNA analysis. Using the same test data as the FBI but a different method of calculating the probability of a random match, Dr. Boonlayangoor determined that the probability of a random match could be from 1 in 745 to 1 in 4,212. Dr. Boonlayangoor admitted that his method of calculation was not recommended in the NRC Report and was even more conservative. He also admitted that his method of calculation was used by no other scientist.

Kandie Dalcollo, defendant's wife, testified that between 2 and 3 a.m. on July 14, 1990, she heard defendant leave the house. She remained awake for the next 15 minutes, and during that time she did not hear her husband's car start. Mrs. Dalcollo next saw defendant at 6 a.m. that day. She admitted that she did not know where defendant was between 3:30 a.m. and 6 a.m. She described defendant as having a moustache and beard on July 14, 1990. Margaret Dalcollo, defendant's mother, testified that on July 14, 1990, at 5 a.m., she found defendant asleep in his car. She also testified that defendant's car, an El Camino, was not operable on July 14, 1990.

Defendant, a convicted thief, testified that on July 14, 1990, from approximately 2:30 to 5 a.m., he was asleep in his car. Between 5 and 5:10 a.m., his mother woke him. According to defendant, his car was inoperable at that time. At the conclusion of defendant's testimony, the defense rested. After closing arguments, the jury returned a verdict of guilty.

## DISCUSSION

Defendant has four principal contentions on appeal: (1) the trial court erred in admitting the DNA test results; (2) the trial court erred in denying defendant's motion to suppress identification evidence; (3) the prosecutor's comments in closing argument denied him a fair trial; and (4) he was not proved guilty beyond a reasonable doubt.

## I

Defendant's first contention is that the trial court erred in admitting the DNA test results. Defendant posits two alternative arguments in support of this contention: (1) the trial court erred in refusing to conduct a *Frye* hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) on the admissibility of the DNA test results; and (2) the trial court erred in admitting the DNA test results.

## A

(This material was nonpublishable pursuant to Supreme Court Rule 23.)

## B

Defendant next argues that the trial court erred in admitting the DNA evidence. Defendant apparently does not challenge whether the FBI's RFLP matching procedures are generally accepted in the relevant scientific community. Defendant instead makes one principal challenge to the admission of DNA test results in this case, namely, that the FBI's manner of determining the statistical probability of a random match of DNA profiles is not generally accepted in the relevant scientific community. Our subsequent analysis, therefore, will be limited to this one issue.

■ The admission of scientific evidence in Illinois is governed by the test set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *People v. Eyler*, 133 Ill. 2d 173, 211 (1989); *People v. Baynes*, 88 Ill. 2d 225, 241 (1981). But see *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 125 L. Ed. 2d 469, 480, 113 S. Ct. 2786, 2794 (1993) (*Frye* test no longer applicable in federal trials). The classic statement of the test is found in *Frye* itself:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014.

In other words, evidence is admissible when the scientific principle on which it rests has gained general acceptance in the relevant scientific community. *People v. Acri*, 277 Ill. App. 3d 1030, 1033 (1996). A reviewing court will not disturb a trial court's determination to admit evidence pursuant to the *Frye* standard absent an abuse of discretion. *Eyler*, 133 Ill. 2d at 211-12.

To date, our supreme court has not addressed whether DNA test results are admissible, although it has indicated it will in the appropriate case. See *Franson v. Micelli*, 172 Ill. 2d 352, 355 (1996) (vacating, *sua sponte*, appellate court decision which held that the trial court erred in considering DNA evidence, where the trial court failed to enter a final appealable judgment); *People v. Moore*, 171 Ill. 2d 74, 98 (1996) (holding that it need not decide the "interesting" issue of whether the FBI's DNA probability calculation method satis-

fied *Frye* because the admission of the DNA evidence was harmless error).

The Illinois Appellate Court, in contrast, has issued a multitude of opinions on this issue. See, *e.g., Franson v. Micelli*, 269 Ill. App. 3d 20 (1994), *vacated on other grounds & appeal dismissed*, 172 Ill. 2d 352 (1996); *People v. Heaton*, 266 Ill. App. 3d 469 (1994); *People v. Johnson*, 262 Ill. App. 3d 565 (1994); *People v. Stremmel*, 258 Ill. App. 3d 93 (1994); *People v. Watson*, 257 Ill. App. 3d 915 (1994); *People v. Miles*, 217 Ill. App. 3d 393 (1991); *People v. Lipscomb*, 215 Ill. App. 3d 413 (1991). Before addressing defendant's arguments, we believe it is appropriate to analyze briefly these opinions.

The fourth district first addressed the issue in *People v. Lipscomb*, 215 Ill. App. 3d 413 (1991), and *People v. Miles*, 217 Ill. App. 3d 393 (1991). In *Lipscomb*, the trial court found that the RFLP analysis and the frequency procedures for determining the statistical probability of a random match were generally accepted in the relevant scientific communities. On appeal, the defendant argued that the trial court improperly applied the *Frye* test to DNA testing generally. According to the defendant, the trial court should have applied the *Frye* test to the specific procedures of DNA testing, such as the procedure for determining the statistical probability of a random match. The *Lipscomb* court rejected this argument. The court reasoned that *Frye* applied to new scientific principles and that the principle involved "is the general DNA forensic analysis" and not the procedures used within that framework. *Lipscomb*, 215 Ill. App. 3d at 432-33. The court then held that "[a]ny question concerning the specific procedures used by the company [performing DNA analyses] or expert goes to the reliability of the evidence and is properly considered by the jury in determining what weight to give to this evidence." *Lipscomb*, 215 Ill. App. 3d at 432.

In *Miles*, the defendant challenged on appeal the admissibility of the DNA test results on the ground that the probability statistics, as calculated by the product rule, were inadmissible. *Miles*, 217 Ill. App. 3d at 402. Relying on *Lipscomb*, the *Miles* court held that the DNA test results were admissible. The court reasoned that the *Lipscomb* court implicitly held that the process of generating probability statistics was an integral part of the DNA identification process and that, because this process satisfied the *Frye* test, probability statistics calculated thereby were admissible. *Miles*, 217 Ill. App. 3d at 405.

In *People v. Watson*, 257 Ill. App. 3d 915 (1994), the first district retreated from *Lipscomb* and *Miles*. In *Watson*, the State appealed the trial court's exclusion of DNA evidence on the ground it did not satisfy the *Frye* test. The *Watson* court initially agreed with *Lips-*

*comb* and *Miles* that the theory underlying DNA profiling is generally accepted in the relevant scientific community. However, whereas the *Lipscomb* and *Miles* courts had then concluded that the procedures used when performing DNA analyses were admissible, the *Watson* court proceeded to subject each step in the DNA methodology to the *Frye* test. After doing so, the court concluded that the RFLP technique used for matching DNA profiles was generally accepted, but that the manner of calculating the statistical probability of a random match was not. *Watson*, 257 Ill. App. 3d at 929-30.

Soon after *Watson*, the second district issued *People v. Stremmel*, 258 Ill. App. 3d 93 (1994). In *Stremmel*, the trial court ruled that the relevant scientific community generally accepted the reliability of the FBI's procedures and protocols to determine both the existence of a DNA match and the statistical probability of a random match. Relying on *Lipscomb* and *Miles*, and without any reference to *Watson*, the *Stremmel* court affirmed this ruling and rejected the defendant's argument that the actual testing procedures performed in a particular case were also subject to the *Frye* test. *Stremmel*, 258 Ill. App. 3d at 106.

The fourth district reentered the debate with *People v. Johnson*, 262 Ill. App. 3d 565 (1994). In *Johnson*, the defendant argued that DNA evidence in general was inadmissible. Relying on *Lipscomb* and *Miles*, the *Johnson* court rejected this argument and held that DNA testimony, including testimony about the statistical probability of a random match, was admissible. *Johnson*, 262 Ill. App. 3d at 569. In doing so, the *Johnson* court noted the *Watson* court's disagreement with *Lipscomb* and *Miles*. *Johnson*, 262 Ill. App. 3d at 570.

In *People v. Heaton*, 266 Ill. App. 3d 469 (1994), the fifth district partially rejected *Watson*. In *Heaton*, relying solely on the NRC Report, the defendant argued that the DNA evidence was inadmissible because the product rule method used in calculating the statistical probability of a random match did not satisfy *Frye*. A divided court held that the trial court did not abuse its discretion in admitting DNA test results. While acknowledging a debate over the product rule, the *Heaton* court held that it would not rely on the NRC Report because it was never brought to the trial court's attention. *Heaton*, 266 Ill. App. 3d at 475-78. Justice Rarick dissented and argued that the court should conduct a broad review of the record. *Heaton*, 266 Ill. App. 3d at 480 (Rarick, J., dissenting). Justice Rarick then stated that the calculation of the statistical probability of a random match should be subjected to the *Frye* test and that, based on the NRC Report, the statistical probability analysis is not generally accepted in the relevant scientific community. *Heaton*, 266 Ill. App. 3d at 480-81 (Rarick, J., dissenting).

In *Franson v. Micelli,* 269 Ill. App. 3d 20 (1994), *vacated on other grounds & appeal dismissed,* 172 Ill. 2d 352 (1996), the first district continued to adhere to its previous holding in *Watson.*[1] In *Franson,* the defendant argued that the statistical probability evidence should not have been admitted because the procedures by which that evidence was derived were not generally accepted in the relevant scientific community. The *Franson* court held that the *Frye* test was applicable to the procedures involved in the general DNA forensic analysis. *Franson,* 269 Ill. App. 3d at 29. The *Franson* court then held, after conducting a broad review of the record, that the manner of determining the statistical significance of a match of DNA profiles was not generally accepted. *Franson,* 269 Ill. App. 3d at 30.

Having reviewed the principal Illinois cases on the admissibility of DNA evidence, we now shift our attention to the case at bar. Defendant urges us to conduct a broad review of the record and consider the NRC Report, even though he never presented this report to the trial court. Defendant argues that the NRC Report establishes that the product rule method for calculating the statistical probability of a random match does not satisfy the *Frye* test because it is not generally accepted within the relevant scientific community. As such, defendant argues, the trial court erred in admitting the DNA test results.

Analytically, defendant's argument compels us to answer three questions: (1) may we consider and rely upon legal and scientific commentaries when reviewing the trial court's determinations regarding the admissibility of DNA evidence, even if the commentaries were not originally before the trial court? (2) are the procedures used to apply a scientific theory subject to the *Frye* test? and (3) if so, is the FBI's method of calculating the statistical probability of a random match generally accepted in the relevant scientific community? As we explain below, we answer each question in the affirmative.

(1)

█ The first question we must answer is whether we may consider and rely upon legal and scientific commentaries when viewing the trial court's determinations regarding the admissibility of DNA evidence, even if the commentaries were not originally before the trial court. Defendant urges us to conduct a broad review of the record

---

[1]Recently, the supreme court vacated *Franson* and dismissed the appeal on the ground that both it and the appellate court lacked jurisdiction to hear the appeal. However, we find much of the *Franson* court's reasoning instructive and therefore refer to it in our decision.

and consider materials such as the NRC Report in reviewing the trial court's determinations.

Generally, a reviewing court will not disturb a trial court's determination to admit evidence pursuant to the *Frye* standard absent an abuse of discretion. *Eyler*, 133 Ill. 2d at 211-12. Some courts interpret this standard of review so as to require a reviewing court to determine the issues on appeal based solely on the trial court record. See *Heaton*, 266 Ill. App. 3d at 476-77; *People v. Mehlberg*, 249 Ill. App. 3d 499, 530-32 (1993). We do not. Where the question of the general acceptance of a new scientific theory or technique is raised, the court is oftentimes asked to establish the law of the jurisdiction for future cases. *Watson*, 257 Ill. App. 3d at 923-24; *Heaton*, 266 Ill. App. 3d at 479-80 (Rarick, J., dissenting); accord *United States v. Porter*, 618 A.2d 629, 635 (D.C. App. 1992). This is certainly true in the present case. Thus, in recognition of the fact that the formulation of the law is a "quintessentially appellate function" (*Porter*, 618 A.2d at 635), we will engage in a broad review of the trial court's determination with respect to the general acceptance of forensic DNA analysis. See *Watson*, 257 Ill. App. 3d at 923-24; *Heaton*, 266 Ill. App. 3d at 479-80 (Rarick, J., dissenting). In doing so, we may consider the expert evidence presented in the trial court, judicial opinions from other jurisdictions, and any pertinent legal and scientific commentaries. See *Watson*, 257 Ill. App. 3d at 924.

We note that the position we adopt today—engaging in a broad review of the trial court's determination—accords with the practice of our supreme court when it has considered the admissibility of a scientific theory in a given case. See, *e.g.*, *Eyler*, 133 Ill. 2d at 215 (adopting the reasoning and conclusion of *People v. Partee*, 157 Ill. App. 3d 231 (1987), to hold that electrophoresis is generally accepted in the relevant scientific community; *Partee*, in turn, relied upon scientific commentaries that were apparently not before the trial court); *People v. Zayas*, 131 Ill. 2d 284, 289-90 (1989) (considering various legal and scientific commentaries to support conclusion that hypnotically enhanced testimony was inadmissible); *Baynes*, 88 Ill. 2d at 234-37 (considering and relying upon various scientific commentaries to support the conclusion that polygraph tests are inadmissible).

## (2)

■ Having answered the first question in the affirmative, we must now answer the second: are the procedures used to apply a scientific theory subject to the *Frye* test? Under the *Lipscomb/Miles* line of cases, the procedure for calculating probability statistics is not subject to the *Frye* test. Rather, probability statistics are admissible because

the DNA evidence in general satisfied the *Frye* test. As *Miles* explained:

> "Implicitly, the [*Lipscomb*] court held the process of generating probability statistics is an integral part of the DNA identification process. Because the DNA identification process meets the *Frye* test and is admissible, probability statistics operated thereby are admissible." *Miles*, 217 Ill. App. 3d at 405.

We disagree. In our view, application of the *Frye* test to determine the admissibility of DNA evidence requires that both the theory and the techniques or procedures implementing the theory must be generally accepted in the relevant scientific community. See *Franson*, 269 Ill. App. 3d at 30; *Watson*, 257 Ill. App. 3d at 929; accord *Bible*, 175 Ariz. at 586-87, 858 P.2d at 1189-90; *Lindsey v. People*, 892 P.2d 281, 290 (Colo. 1995); *Vargas v. State*, 640 So. 2d 1139, 1150 (Fla. App. 1994), *rev'd on other grounds*, 667 So. 2d 175 (Fla. 1995); *Commonwealth v. Curnin*, 409 Mass. 218, 224-26, 565 N.E.2d 440, 444-45 (1991); *State v. Carter*, 246 Neb. 953, 982, 524 N.W.2d 763, 782 (1994); *State v. Vandebogart (DNA)*, 136 N.H. 365, 376, 616 A.2d 483, 490 (1992); *Commonwealth v. Crews*, 536 Pa. 508, 523, 640 A.2d 395, 402 (1994); *State v. Cauthron*, 120 Wash. 2d 879, 888-89, 846 P.2d 502, 506-07 (1993). We reach this conclusion for two reasons.

First, *Frye* requires that the "thing" from which the deduction is made—*e.g.*, the procedures upon which the DNA results are based—must be generally accepted. Undoubtedly, the theory behind DNA testing is generally accepted. Contrary to the position espoused by the *Lipscomb/Miles* line of cases, however, the procedures used to implement the theory are still subject to the *Frye* test. As the *Franson* court cogently explained:

> "Under *Frye*, if the procedure or 'thing' upon which the DNA result was determined is not generally accepted, then the result is inadmissible. For instance, DNA testing to determine a 'match' may be well recognized, but the 'thing' upon which the result is based is the procedure used to arrive at the determination of whether there is a 'match.' Thus, if the procedures are not generally accepted, then the result is inadmissible under *Frye*. Similarly, although it may be generally accepted that statistical probabilities can be calculated based upon the 'matching' results, if the method used to calculate the statistical probabilities is not generally accepted as valid in the relevant scientific community, then the statistics should be inadmissible." *Franson*, 269 Ill. App. 3d at 29-30.

Second, merely " '[b]ecause the DNA identification process meets the *Frye* test' " does not mean that " 'probability statistics operated thereby' " are admissible. *Franson*, 269 Ill. App. 3d at 30, quoting

*Miles*, 217 Ill. App. 3d at 405, 577 N.E.2d at 485. The procedures used to "match" DNA samples are separate and result in different findings than the procedures underlying probability statistics. The result of DNA identification procedures is the determination of whether the DNA samples "match." The result of statistical probability procedures is the determination of the frequency of a "match" in the relevant population. Thus, merely because DNA identification procedures may be generally accepted and the results admissible does not mean that subsequent statistical probabilities are admissible if the statistical probability procedures are not generally accepted. See *Franson*, 269 Ill. App. 3d at 30.

Accordingly, we hold that the *Frye* test requires that both the theory and the techniques or procedures implementing the theory must be generally accepted in the relevant scientific community. See *Franson*, 269 Ill. App. 3d at 30; *Watson*, 257 Ill. App. 3d at 929. This holding, however, should not be read as requiring that the specific procedures used in a particular case are also subject to the *Frye* test. See *Watson*, 257 Ill. App. 3d at 929; see also *Vandebogart*, 136 N.H. at 376, 616 A.2d at 490 (*Frye* test does not include whether the testing laboratory performed the accepted scientific procedures in analyzing the forensic samples in a particular case). We have no quarrel with those cases which hold that any concerns with the specific procedures used in a particular case go to the reliability and weight of the evidence. See, *e.g.*, *Stremmel*, 258 Ill. App. 3d at 106; *Miles*, 217 Ill. App. 3d at 402-03; *Lipscomb*, 215 Ill. App. 3d at 432.

### (3)

We now arrive at the heart of the contention—whether the FBI's method of calculating the statistical probability of a random match is generally accepted in the relevant scientific community. Defendant maintains that the NRC Report and other scientific commentaries demonstrate that probability statistics are not generally accepted. He therefore asks us to reverse his conviction and remand the cause for a new trial.

■ In determining whether a novel scientific procedure is "generally accepted" in the scientific community, the issue is consensus versus controversy over a particular technique. *Porter*, 618 A.2d at 634. General acceptance does not require scientific unanimity. *Lindsey*, 892 P.2d at 289; *People v. Wesley*, 83 N.Y.2d 417, 423, 633 N.E.2d 451, 454, 611 N.Y.S.2d 97, 100 (1994). Moreover, the mere existence of a dispute does not preclude a finding that a procedure is generally accepted. *Lindsey*, 892 P.2d at 289; *People v. Soto*, 43 Cal. App. 4th 1783, 1801, 35 Cal. Rptr. 2d 846, 856 (1994). Rather, only significant

disputes between qualified experts will preclude a finding of "general acceptance." *Cauthron*, 120 Wash. 2d at 887, 846 P.2d at 505; *Porter*, 618 A.2d at 634; see *Acri*, 277 Ill. App. 3d at 1033-34 (reliability of uncorroborated alerts by accelerant-sniffing dogs in the field of arson investigation was not generally accepted; both sides on the issue were evenly split and adamant in their positions).

■ With these principles in mind, we now turn to whether the FBI's method of calculating the statistical probability of a random match is generally accepted in the relevant scientific community. As Dr. Deadman testified, a match is only a statement that the DNA in the crime scene sample *could have* originated from the defendant. The FBI therefore estimates, by using the product rule, the statistical probability of a random match between the DNA sample taken from the crime scene and the DNA sample taken from the defendant. In other words, the FBI estimates the frequency of the particular DNA test sample occurring in a population unit. In making this estimate, the FBI compares the DNA samples to a previously constructed population database.

According to the scientific literature, the product rule relies on two assumptions, both of which must exist for its calculations to be accurate. The first, known as "Hardy-Weinberg equilibrium," assumes that the members of the racial groups represented in the databases mate randomly within their group and thus mix the gene pool evenly. The second, known as "linkage equilibrium," assumes that the DNA bands identified by the RFLP procedures are not related to each other and thus are independent in a statistical sense. See generally R. Lewotin & D. Hartl, *Population Genetics in Forensic DNA Typing*, 254 Science 1745 (1991) (Lewotin & Hartl); see also *State v. Johnson*, 183 Ariz. 623, 627-28, 905 P.2d 1002, 1006-07 (Ariz. App. 1995); *Cauthron*, 120 Wash. 2d at 899-903, 846 P.2d at 512-14.

Although DNA test results have been admitted in criminal cases since 1988 (see *People v. Wardell*, 230 Ill. App. 3d 1093, 1101 (1992)), the product rule was generally unchallenged until 1991. In December of that year, Science, a respected scientific journal with articles subject to peer review, published two articles which posited radically conflicting views of statistical probability calculations. Compare Lewotin & Hartl, at 1745, with R. Chakraborty & K. Kidd, *The Utility of DNA Typing in Forensic Work*, 254 Science 1735 (1991) (Chakraborty & Kidd). Four months later, the National Academy of Sciences published the results of a two-year study on the viability of DNA testing. See National Research Council, Committee on DNA Technology in Forensic Science, *DNA Technology in Forensic Science* (1992) (NRC Report).

We will not add to the already voluminous materials that have described the nature of the debate that developed as a result of the foregoing publications. Suffice it to say that the debate centered on the possibility of subgrouping among populations. Subgrouping is based on the premise that census populations designated "Caucasian," "Black," or "Hispanic" actually consist of multiple genetically diverse subpopulations. If subgrouping occurs, then some scientists and population geneticists opine that it may cause both Hardy-Weinberg and linkage disequilibrium, which would render statistical probability calculations inaccurate. See Lewotin & Hartl, at 1746. For the curious reader, a more detailed account of the debate is located in the following materials: *Watson*, 257 Ill. App. 3d at 929-33, citing *People v. Barney*, 8 Cal. App. 4th 798, 814-19, 10 Cal. Rptr. 2d 731, 740-43 (1992); *Lindsey*, 892 P.2d at 287, 293-95; *Bible*, 175 Ariz. at 584-86, 858 P.2d at 1187-89; NRC Report, at 74-75, cited in *Cauthron*, 120 Wash. 2d at 902-03, 846 P.2d at 514; Lewotin & Hartl, at 1745; Chakraborty & Kidd, at 1735.

Riding the crest of this alleged "bitter debate" (see L. Roberts, *Fight Erupts Over DNA Fingerprinting*, 254 Science 1721, 1723 (1991)), some courts have rejected testimony on probability statistics on the ground that the calculations were not generally accepted in the scientific community. See, *e.g.*, *Bible*, 175 Ariz. at 585-86, 858 P.2d at 1188-89; *Barney*, 8 Cal. App. 4th at 820, 10 Cal. Rptr. 2d at 745; *Commonwealth v. Lanigan*, 413 Mass. 154, 162-63, 596 N.E.2d 311, 316 (1992). Other courts, including some in Illinois, have remanded the case for further consideration on whether the ceiling principle, a conservative method of estimating probabilities that attempts to account for population subgrouping, is generally accepted. See, *e.g.*, *Franson*, 269 Ill. App. 3d at 30; *Watson*, 257 Ill. App. 3d at 935-36; *State v. Sivri*, 231 Conn. 115, 161, 646 A.2d 169, 192 (1994); *Porter*, 618 A.2d at 642; *Vandebogart*, 136 N.H. at 383, 616 A.2d at 494-95.

We need not decide whether these cases were properly decided. Even if the foregoing publications ignited a "bitter debate" in the scientific community, and thus demonstrated that the calculation of probability statistics was not generally accepted in the scientific community, the debate has clearly calmed in the last several years. This calming is attributable to two developments not considered by the foregoing cases.

The first is the recognition by scientists that more conservative methods to calculate statistical probabilities do not create a corresponding reduction in random match probability calculations. The NRC Report recommended that scientists use the ceiling principle, as

opposed to the product rule, to calculate statistical probabilities. However, Eric Lander, an early critic of the use of probability statistics, as well as a coauthor of the NRC Report, and Bruce Budowle, one of the principal architects of the FBI's DNA program, have observed that the use of this more conservative method does not create a corresponding reduction in random match probability calculations. See E. Lander & B. Budowle, *DNA Fingerprinting Dispute Laid to Rest*, 371 Nature 735 (1994).

The second development is the FBI's completion of an exhaustive worldwide population survey, a survey which was recommended by the NRC Report. See United States Department of Justice, Federal Bureau of Investigation, *I-A VNTR Population Data: A Worldwide Study* (1993) (FBI Study), cited in *People v. Amundson*, 43 Cal. App. 4th 1503, 1521, 41 Cal. Rptr. 2d 127, 137 (1995), and *Lindsey*, 892 P.2d at 294. The study rebutted the assumption that population subgrouping affected DNA probability estimates to a defendant's disadvantage. FBI Study, at 2, cited in *Amundson*, 43 Cal. App. 4th at 1521, 41 Cal. Rptr. 2d at 137. Specifically, the study found, *inter alia*, that (1) subdivisions in a major population group do not substantially affect forensic estimates of the likelihood of a DNA profile; and (2) estimates of the likelihood of occurrence of a DNA profile using major population group databases (*e.g.*, Caucasian, Black, and Hispanic) provide a greater range of frequencies than would estimates for subgroups of a major population category. FBI Study, at 2, cited in *Lindsey*, 892 P.2d at 294. Based on these findings, the study concluded that the estimate of the likelihood of occurrence of a DNA profile derived by the current practice of employing the product rule and using general population databases is reliable, valid, and meaningful, without forensically significant consequences. FBI Study, at 2, cited in *Lindsey*, 892 P.2d at 294.

These developments clearly debunk the notion that a "bitter debate"—if ever there was one—is still raging in the scientific community. Thus, we conclude that the FBI's calculation of statistical probabilities, as derived by the product rule, is generally accepted in the scientific community. Accord *Amundson*, 43 Cal. App. 4th at 1521, 41 Cal. Rptr. 2d at 138; *People v. Chandler*, 211 Mich. App. 604, 610-11, 536 N.W.2d 799, 803 (1995); *Lindsey*, 892 P.2d at 294. As such, the trial court did not err in admitting the DNA test results.

We note that our holding today is distinguishable from those reached in prior Illinois cases. In the *Lipscomb/Miles* line of cases, the courts did not consider the compelling materials we do today. Similarly, although the *Watson* and *Franson* courts considered some of these materials, they did not consider all of them.

## II
## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

COLWELL and RATHJE, JJ., concur.